**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**CAROLINA FREIGHT CARRIERS CORPORATION, Defendant.**

No. 87-6322-CIV-JAG.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Oct. 26, 1989.

Lois A. Foster–Steers and Angelo Filippi, Equal Opportunity Com'n, Miami Dist. Office, Miami, Fla., for plaintiff.

Peter R. Corbin and Richard Marguilies, Corbin & Dickinson, Jacksonville, Fla., for defendant.

## FINAL ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the court upon the bench trial held on June 6–8, 1989.

The plaintiff, the Equal Employment Opportunity Commission (EEOC), is suing the

defendant, Carolina Freight Carriers Corporation (Carolina Freight), alleging unlawful employment practices violative of Title VII of the Civil Rights Act of 1964, as amended. The action is brought on behalf of Francisco Rios (Rios).

Specifically, the EEOC alleges that Carolina Freight violated section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), when it refused to hire Rios as a full-time truck driver at its terminal located in Hollywood, Florida because of his national origin, Hispanic. The EEOC further contends that the defendant retaliated against Rios when it discontinued the use of his services as a casual driver for filing a charge of discrimination, thereby violating section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). Finally, the EEOC claims that Carolina Freight maintained an employment policy which violated section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1).

The Court, having considered the pleadings, the parties' stipulations, and the evidence and argument of able counsel heard at the trial, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1. The plaintiff, EEOC, is an agency of the United States of America, charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to file suit by section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1).

2. The defendant, Carolina Freight Carriers Corporation, is a North Carolina corporation doing business in the state of Florida and in Broward County, Florida and has at least 15 employees and had at least 15 employees in 1984.

3. At all relevant times, Carolina Freight has continuously been and is now an employer engaged in an industry affecting commerce within the meaning of section 701(b), (g), and (h) of Title VII, 42 U.S.C. § 2000e(b), (g), and (h).

4. Francisco Rios is of Hispanic national origin having been born in Puerto Rico.

5. In 1968, Francisco Rios was convicted of receiving stolen property and was sentenced to probation.

6. In 1969, Rios was convicted of a felony, larceny, and was sentenced to 24 to 60 months in prison of which he served 18 months prior to being released.

7. Mr. Rios had prior experience driving tractor trailers. After his release from prison, he worked for Andora Trucking. Subsequently, he held driving positions with Capital Trucking and Commercial Transport, both located in Pennsylvania. Also, Mr. Rios completed a course at the Ryder Truck Driving School in New Jersey prior to applying for employment with Carolina Freight.

After he moved to Florida in 1979, Rios then worked with Gateway and Yellow Freight.

8. At all relevant times, Carolina Freight maintained a terminal in Hollywood, Florida which was also known as the Fort Lauderdale terminal.

9. On July 28, 1980, Francisco Rios completed an application for employment with Carolina Freight at its Fort Lauderdale terminal. In response to the following question on the employment application: "Have you ever been convicted of a crime other than minor traffic violations?" Rios responded "no". Although Rios had completed applications with other employers which contained a time limit with respect to prior convictions, the Carolina Freight application contained no such limitation. Rios also claims he did not notice the word "ever" as he did not fully read the application.

10. In 1971, Carolina Freight entered into a Consent decree with the United States Department of Justice entitled *United States v. Carolina Freight Carriers Corp.*, civil action number 2970(W.D.N.C.). One aspect of the Decree was a minimum standard for line driver applicants with prior criminal convictions, which provides that an applicant shall have:

(1) No more than three criminal convictions (excluding convictions for motor vehicle violations) within the three year period immediately preceding

the application date for employment wherein the sentence is $25.00 or less, or both;

(2) No criminal conviction (excluding convictions for motor vehicle violations) within the three year period immediately preceding the application date wherein the sentence exceeded a $25.00 fine or six months suspension or both; and

(3) No felony, theft, or larceny conviction within the applicant's lifetime which resulted in an active prison or jail sentence.

11. In addition to the minimum standard relating to convictions, applicants for local driver positions are required to meet the following additional standards:

(a) One year of tractor trailer experience or graduation from an approved truck driving school;

(b) No chargeable accident within one year preceding the date of application;

(c) No more than three moving violations or chargeable accidents or a combination thereof within three years preceding the date of application;

(d) If a veteran, no dishonorable discharge from the armed forces; and

(e) Must be at least 21 years of age.

Applicants are also required to read, sign, and date a form certifying that they meet the minimum qualification standards.

12. Applicants for employment with Carolina Freight are also required to submit to a polygraph examination. The employment application specifically states that the information provided by the applicant for the purpose of securing employment is true and correct and that false statements made by the applicant may result in the application not being considered or the individual's dismissal in the event employment is begun.

13. On November 1, 1980, Francisco Rios was given a polygraph test. The polygraph report revealed that Rios disclosed his prior felony convictions and the sentences imposed.

14. At the time of applying for employment with Carolina Freight to the present day, Mr. Rios had a valid Florida driver's license and no traffic convictions.

15. As part of the application process, Mr. Rios successfully completed a road test and a written test and he meet the physical health requirements.

16. Carolina Freight transports less than full capacity tractor trailers. It carries approximately twenty percent of its freight which is considered "high risk" including: computers, video equipment, televisions, volatile gases, munitions, and drugs. Carolina Freight's vehicles are worth approximately $100,000 and the freight carried has an average value in excess of $100,000.

17. Carolina Freight suffered the following business losses from theft during the years 1980 to 1986 as a result of stolen freight.

| Year | Ft. Lauderdale Terminal | Carolina Freight Corporate Loss |
| --- | --- | --- |
| 1980 | $ 2,455.29 | $162,205.13 |
| 1981 | 11,732.76 | 168,799.41 |
| 1982 | 10,355.95 | 249,504.24 |
| 1983 | 6,741.21 | 136,099.93 |
| 1984 | 13,488.92 | 193,213.50 |
| 1985 | 57,857.76 | 239,198.14 |
| 1986 | 3,000(approximate) | unknown |

18. Carolina Freight classifies losses from theft after the freight is loaded and checked onto a truck at the terminal but does not arrive at its destination. The com-

pany's loss from nonemployee theft accounts for approximately 15% while the remaining 85% is attributed to employee misconduct.

19. Because of the fact that Carolina Freight's drivers work largely unsupervised, the company has concluded that drivers are the primary source of losses from theft at the terminal level.

20. Carolina Freight has utilized a number of methods to control theft at the terminal level including the adoption of the minimum qualifications standard regarding prior convictions. Carolina Freight considers this standard to be an effective and integral means of controlling theft before it ever occurs. Further, the company believes that immediate firings of thieving employees acts as a strong deterrent to theft. The company has been unsuccessful in gathering sufficient evidence to initiate criminal prosecutions.

21. Carolina Freight's percentage of losses from theft is lower than the average for the trucking industry.

22. Some trucking companies other than Carolina Freight require disclosure of only those previous convictions which preceded the application by five to ten years.

However, there is no evidence that a less restrictive conviction policy than Carolina Freight's three-tier approach is either equally effective in deterring employee theft or would have a less adverse impact upon the hiring of Hispanic applicants.

23. Francisco Rios began working as a casual truck driver for Carolina Freight at the Fort Lauderdale terminal on or around July 28, 1980.

24. Carolina Freight maintains its headquarters in Cherryville, North Carolina and has terminals throughout the United States. An applicant's file for regular, full-time employment as a truck driver with the company is submitted to the personnel office in Cherryville, whose purpose is to review the application to ensure compliance with the company's minimum qualification standards.

25. Although Mr. Rios admitted his conviction record in the polygraph examination administered in November 1980, Carolina Freights' management was not aware of it when Rios was hired. The results of the polygraph examinations were normally returned to the district manager at the Fort Lauderdale terminal. However, David Brown, who was the manager at the time of Rios' application, had no memory of seeing Rios' polygraph. The examination did find its way into Rios' personnel file. Brown overlooked the examination and did not notice Rios' conviction record in 1980. The policy of management at the Fort Lauderdale terminal was to only forward a casual's personnel file to the Cherryville office if the worker was being considered for a regular position.

26. Carolina Freight's peak business period is September through November of the year.

27. Mr. Rios was a good employee during his four years of employment with Carolina Freight. There were no performance problems and Mr. Rios was never suspected of any theft.

28. Casual truck drivers are referred to Carolina Freight's terminal for employment by the local union hall. Following completion of the application, casual employees are utilized on an "as needed" basis by the terminal's operations manager. The individual in charge of the facility, the district manager, is not usually involved in the day-to-day use of casual employees. Workers are called to work by the terminal's dispatcher after the operations manager specifies how many casuals are need to work for that day. The district manager is only involved with hiring decisions when a casual employee is being considered for a regular position.

29. Carolina Freight was a party to the National Master Freight Agreement and Southern Conference Area Local Freight Forwarding Pick Up and Delivery Supplemental Agreement at all relevant times hereto.

Employees for full-time, regular employment are usually selected from the ranks of causal drivers. It is the district manager's responsibility to promote workers to a

regular position considering such factors as the length of service, recommendations of the operations manager, and whether the candidate meets the company's minimum standards.

30. Casual employees receive the same hourly pay as regular employees under the National Master Freight Agreement and also receive a contribution to the Teamster's Pension Fund. Casual workers, unlike regular employees, do not receive other fringe benefits such as health insurance, paid holidays, or paid vacations, and they are not guaranteed a forty hour work week.

31. Casual truck drivers perform the same basic duties as regular truck drivers at Carolina Freight. Both types of drivers must be qualified to handle a tractor trailer. Among their other job responsibilities, drivers are dispatched to customers with freight bills covering the cargo loaded on the trailers. It is their responsibility to deliver the correct quantity of freight as shown on the bill of lading covering the shipment. Drivers are also responsible for the collection of money, for notifying the company of shortages in shipments, and for picking up freight from customers. After their deliveries, drivers return to the terminal and submit their freight bills, bills of lading for new shipments, and any cash collected for that day. Each truck is equipped with a radio to contact the driver from the terminal for special instructions. Other than radio contact, drivers are unsupervised once they leave the terminal.

32. On May 17, 1981, Dale Tarpenning, a White American, was promoted from casual employment with Carolina Freight to a regular driving position.

33. Roel Gordon, a Black Jamaican, was hired as a regular driver on May 18, 1981. Next, John Accamando and John Cannon, both White Americans, were hired as regulars on November 21, 1981 and November 22, 1981, respectively.

34. In 1981, Charles Cypher, a White American, was considered for promotion from casual to a regular position with Carolina Freight. Unlike Mr. Rios' application, Cypher's personnel file was forwarded to the Cherryville office. Mac Brawley, who was employed at the corporation's headquarters, directed Bob Austrell to check on a potential discrepancy in Cypher's file regarding the length of his driving service. David Brown discussed the matter with Cypher. Upon consideration, Carolina Freight's management concluded Cypher did not meet the company's standards and he was terminated as a casual employee.

35. When Accamando and Cannon were hired, Rios asked Brown why he was not hired. Brown told him that the two others were more qualified. Subsequently, Rios filed a charge of discrimination with the EEOC in 1981 alleging that he had been denied promotion on the basis of his Hispanic origin. The charge was later withdrawn.

36. In January 1983, Brown was terminated by Carolina Freight as district manager at its Fort Lauderdale facility.

37. In January 1983, John Henderson was hired as the new operations manager at the terminal approximately seven days prior to Brown's dismissal. Henderson retained this position until October 1984 when he changed jobs and began to work with Consolidated Freightways.

38. Henderson considered Rios to be one of the terminal's best casual drivers. In 1983, he recommended Rios to the district manager for promotion to a regular position.

39. Kenneth Lee was hired as district manager of the Fort Lauderdale terminal on February 28, 1983. His predecessor, Brown, had no communications with him. Lee did not review the personnel files of present employees at the terminal when he began work in 1983.

40. After the hiring of Accamando and Cannon in 1981, Carolina Freight hired no regular employees for almost three years until February 1984. Rios, along with Benjamin Bryant (a Black American), Albert Marshall (a White American), and Paul Bedard (a White American) were considered for this vacancy. In order to update the personnel files of Rios and Bryant to prepare them for submission to the Cherryville

personnel office, the candidates were required to complete the following documents: (1) a new application, (2) a "Driver's Qualifications" form, # CFCC: LE–168, and (3) a consent to undergo a polygraph examination.

In September 1983, Rios signed the statement of minimum qualifications attesting that he had never been convicted of a felony, theft, or larceny which resulted in an active prison or jail sentence. Rios claims that he did not read the form when he signed it since he was working at the time and he also contends that he did not become aware that his signature constituted an acknowledgement that he had met all of the company's minimum standards until he attended a hearing before the Broward County Human Rights Board in 1984.

On September 21, 1983, Rios took a second polygraph test covering the period of his casual employment. The second polygraph did not indicate any further convictions or any evidence of employee theft.

41. Lee relied upon the operations manager, Henderson, to update the personnel files. At some time between September 1983 and February 1984, Lee did review the updated personnel files of those candidates being considered for the promotion and discovered Rios' 1980 polygraph examination. Lee also noticed Rios' two convictions resulting in an active prison sentence and concluded that he was disqualified because of the company's conviction policy. In deciding not to consider Rios for the regular position, Lee did not consider Rios' inaccurate answer on his employment application and his certification of minimum standards regarding the questions on past convictions. Further, Lee also did not consider the consent decree between Carolina Freight and the Justice Department when he decided to reject Rios.

42. Out of the remaining pool of candidates, Carolina Freight's management hired Bryant as a regular driver on February 22, 1984. The Cherryville personnel office and Lee considered the fact that Bryant met all of the company's minimum standards, he was considered by Lee to be the best choice "by far", and he had

worked as a casual since March 1979, before Rios began working with Carolina Freight.

43. Because Lee determined that Rios' conviction record disqualified him from a regular position, he did not forward Rios' personnel file to the Cherryville office for review.

44. Mr. Henderson sent Mr. Rios' personnel file to Lee for a second time in April 1984 for consideration as a candidate for a regular driving position. Mr. Rios was rejected for this position. Instead, Paul Bedard, a White American, was hired as a regular employee on April 9, 1984.

45. There is no evidence that Carolina Freight ever hired any employee, casual or regular, other than Rios who did not meet the company's conviction policy.

46. Mr. Rios filed a charge of discrimination based on his national origin with the EEOC and the Broward County Human Relations Division (BCHRD) on May 16, 1984. This charge was investigated by a Division attorney, Mary–Anne Robertson.

47. On May 24, 1984, the BCHRD mailed a Notice of Charge of Discrimination to Carolina Freight at the company's Fort Lauderdale terminal.

48. On October 2, 1984, the BCHRD mailed a Notice of Hearing to Carolina Freight and Rios for a hearing scheduled for October 16, 1984.

49. In the period between October 2, 1984 and October 16, 1984, Mary–Anne Robertson, a BCHRD attorney in charge of Rios' case, telephoned Carolina Freight's personnel office in Cherryville and spoke with Mac Brawley. Robertson asked why the company persisted in its refusal to promote Rios to a regular position when he was continuing to work at the terminal as a casual employee.

50. Despite their knowledge of Rios' conviction history in the period between September 1983 and February 1984, Carolina Freight's management at the Fort Lauderdale terminal continued to use Rios as a casual worker. There was no order from the Cherryville office before October 1984 directing Rios to be terminated be-

cause the North Carolina office never received his personnel file. Because Rios was a good employee, Kenneth Lee decided to retain his services, at least through the month of November 1984, a peak business period for the Fort Lauderdale terminal.

51. On October 16, 1984, Mr. Rios was terminated as a casual worker for Carolina Freight. Rios was summoned into Kenneth Lee's office on the day that he was discharged. Lee told Rios that he had received orders from "higher up" that he was to be "let go". Lee also stated that Rios was disqualified from further employment because of his convictions. He then gave Rios his business card and offered to serve as a reference for future employers.

52. Mr. Rios' charge of discrimination was litigated before a panel of the Broward County Human Rights Board on November 15, 1984. On November 27, 1984, the panel entered its Final Order finding that Carolina Freight's termination of Rios was not based upon ethnic or national origin discrimination.

53. Rios appealed the panel's decision. On appeal, a quorum of the Human Rights Board affirmed the lower decision by decision rendered March 1, 1985.

54. On October 18, 1984, Mr. Rios began work as a casual truck driver with Consolidated Freightways. He was hired by Mr. Henderson, the former operations manager of Carolina Freight's Fort Lauderdale terminal, who was now a manager employed with Consolidated. On March 30, 1985, Rios was promoted to the position of regular truck driver with Consolidated Freightways, where he is employed as of the present date.

55. The EEOC challenges the defendant's facially neutral employment practice which is that portion of its conviction policy prohibiting the hiring of any applicant who has been convicted of a felony, larceny, or theft crime anytime in his life and who has served an active prison or jail sentence.

56. In attempting to show this portion of Carolina Freight's conviction policy has a disparate impact upon Hispanics, the EEOC relied upon a statistical study performed by Ms. Elvira Sisolak, a senior economist for the EEOC based in Washington, D.C. The purpose of the report was to determine if Carolina Freight hired Hispanic truck drivers in numbers corresponding to the number of Hispanics reasonably available and qualified for this position, without consideration of the conviction standard, to demonstrate the statistically significant impact of the policy upon hiring patterns.

57. Carolina Freight presented expert testimony from Mr. Joseph Perry, a professor in economics and statistics from the University of North Florida, to counter the EEOC's expert analysis on disparate impact.

58. The EEOC study was divided into two parts. The first part, a labor market analysis, included the following components: (1) a description of the employment pattern of the truck driver position at the Fort Lauderdale terminal, (2) estimates of the patterns that would be expected based upon information from other sources, and (3) a comparison of the actual employment at the terminal with these expected patterns. The second part of the study compared rates of prison sentences between Hispanics and non–Hispanic Whites to determine if these groups have different likelihoods of serving active prison terms.

59. With regard to the labor market analysis, the EEOC first examined the hiring patterns at the Fort Lauderdale terminal. The study did not rely upon actual application flow since this information was unavailable. Instead, the EEOC expert utilized external labor market information and data from the 1980 Census of the Population.

60. The Census data is subject to some degree of error. The individuals who provide census information classify themselves as to national origin, ethnicity, and occupation. Moreover, the Census only allows for a single classification whereas, for example, a person could have parents of different races and/or national origins. Finally, the Census underreports individuals of Hispanic origin since the category includes persons from Central and South America

who may also be characterized as Black or Indian.

61. The EEOC did not utilize a market survey in order to determine employment patterns of truck driver positions at the Fort Lauderdale terminal.

62. The term "operative" is employed in the EEOC study. This is a broad occupational category that includes not only all types of truck drivers, from tractor trailers to pickup trucks, but also assembly line workers, machine operators, dry wall installers, tow motor operations, and other similar occupational groups.

63. According to the EEOC report, in 1980, there were 37,439 operatives in Broward County, of which 8.2% were Hispanic.

64. The EEOC report contains the following data on the operatives employed by Carolina Freight at the Fort Lauderdale terminal from 1984 to 1987:

| Year | Number of Operatives | Number of Hispanic Operatives | Percentage of Hispanic Operatives |
|---|---|---|---|
| 1984 | 32 | 0 | 0% |
| 1985 | 39 | 1 | 2.6 |
| 1986 | 42 | 0 | 0 |
| 1987 | 39 | 0 | 0 |

65. In compiling the above data, the EEOC study relied upon Carolina Freight's EEO-1 reports from 1984 through 1987 and a seniority listing containing 32 names. The employees shown for each year include all operatives employed at the terminal for that year, regardless of the initial date of hire. Each of the operatives listed are regular truck drivers at Carolina Freight. The seniority list reads as follows:

| Name | National Origin | Date of Hire |
|---|---|---|
| Washburn, Melvin | White American | 10-16-57 |
| Cox, Clifton | same | 12-14-59 |
| Beard, Walter | same | 11-29-65 |
| Snyder, Robert | same | 6-15-66 |
| Shipman, Albert | Black American | 11-15-66 |
| Sutton, Eugene | White American | 11-06-67 |
| Roper, Donald | same | 3-03-69 |
| Hatterman, Henry | same | 3-14-69 |
| Bess, Robert | same | 8-01-69 |
| Graff, James | same | 8-04-69 |
| Smith, Richard | same | 8-06-69 |
| St. Germain, Ray | same | 11-11-69 |
| Allen, Ralph | same | 3-02-70 |
| Pierce, David | same | 3-19-71 |
| Howes, George | same | 1-02-73 |
| Heap, James | same | 3-12-73 |
| Vizzini, Rosario | same | 10-26-73 |
| Guido, Eric | same | 12-07-73 |
| Hendrix, Richard | same | 6-28-74 |
| Tarr, Robert | same | 1-06-75 |
| Dunn, John | same | 4-18-75 |
| Hill, Richard | same | 12-04-75 |
| Laborde, Huey | same | 11-03-76 |
| Ritchie, Ted | same | 8-26-79 |
| Buskill, Richard | same | 11-12-79 |
| Hibdon, Wendell | same | 4-04-80 |
| Tarpenning, Dale | same | 5-17-81 |
| Gordon, Roel | Black Jamacian | 5-18-81 |

| Name | National Origin | Date of Hire |
|------|-----------------|--------------|
| Accamando, John | White American | 11–21–81 |
| Cannon, John | same | 11–22–81 |
| Bryant, Benjamin | Black American | 2–20–84 |
| Bedard, Paul | White American | 4–09–84 |

66. The EEOC study also contains the following statistical analysis to determine the probability of chance between the expected number of Hispanic employees based upon the estimated number of available Hispanic operatives and the number of Hispanics actually hired at the Fort Lauderdale terminal:

| Year | Total Employees | Hispanic Employees | Availability | Short Fall | Probability |
|------|-----------------|--------------------|--------------|------------|-------------|
| 1984 | 32 | 0 | 14.8% | 5 | .00594384 |
| 1985 | 39 | 1 | 15.8 | 5 | .01016730 |
| 1986 | 42 | 0 | 16.8 | 7 | .00044175 |
| 1987 | 39 | 0 | 17.8 | 7 | .00047863 |

The above short falls in the number of Hispanics who should be employed at Carolina Freight's terminal are statistically significant since they all exceeded the .05 level of probability which equates to approximately two standard deviations.

67. The EEOC expert stated that there was no determination of what percentage of the operatives would be qualified to be heavy truck or tractor trailer drivers. The study also did not show what percentage of the operatives would meet Carolina Freight's other minimum standards for the position of driver such as prior driving record and age.

68. The EEOC report made an availability study of the number of Hispanics who could reasonably be expected to apply to the Fort Lauderdale terminal for truck driving positions. In making this analysis, the EEOC expert considered various facts including:

(a) The Carolina Freight facility is located in Broward County, Florida approximately ten miles south of Fort Lauderdale, the major city in the county. The terminal is less than five miles from the Dade County border and 15 miles from the city of Miami. According to the 1980 Census of the Population, 4.6% of the 310,000 persons working in Broward County lived in Dade County.

(b) In Broward County in 1980, 8.2% of the 37,439 operatives who live in the county were Hispanic, while 62.3% of the 92,732 operatives living in Dade County were Hispanic.

(c) Census data for 1980 by county of residence and county of work provides an estimate that 10.8% of the operatives working in Broward County were Hispanic.

(d) Since 1980, the populations of Broward and Dade Counties have grown steadily, as has the Hispanic population in Dade County.

(e) The number of heavy truck drivers in 1980 was 6,345 in Broward County with 347 of them being Hispanic (5.5% of total). In Dade County, there were 11,380 heavy truck drivers and 4,735 of them were Hispanic (41.6% of total).

69. Considering the above factors and commuting patterns between the counties, the EEOC study concluded that the availability estimates for Hispanics ranged from 14.8% in 1984 to 17.8% in 1987.

70. The EEOC report contained an alternative statistical analysis utilizing the category of heavy truck driver, as used in

the 1980 Census data. The alternative analysis of the availability of Hispanics for truck driver positions in Broward County is as follows:

| Year | Total Employees | Hispanic Employees | Availability | Short Fall | Probability |
|------|-----------------|--------------------|--------------|------------|-------------|
| 1984 | 32 | 0 | 9.1% | 3 | .04721112 |
| 1985 | 39 | 1 | 9.6 | 3 | .10038446 |
| 1986 | 42 | 0 | 10.1 | 4 | .01142634 |
| 1987 | 39 | 0 | 10.6 | 4 | .01265212 |

71. According to the report, the above short falls of heavy truck drivers are statistically significant for 1984, 1986, and 1987 but not in 1985 when a single Hispanic driver was employed at the Fort Lauderdale terminal. For the three years, the statistical disparities exceeded the .05 level of probability (two standard deviations) but were below the .01 level (approximately three standard deviations).

72. Similar to the operative analysis, the study contains an "availability estimate" of 7.1% Hispanics for truck driving positions in Broward County in 1980. Calculating an increase at the rate of one-half percent per year, the study estimates ranges of 9.1% to 10.6% in the years between 1984 through 1987.

73. According to the report, there were 6,345 heavy truck drivers in Broward County in 1980, of which 5.5% or 347 persons were Hispanic. In Dade County, there were 11,380 heavy truck drivers in 1980, of which 41.6% were Hispanic. However, Carolina Freight presented data from the Florida Department of Labor and Employment Security that there were only 3,700 persons in April 1988 that were employed in Broward for trucking and warehousing combined and 8,300 persons likewise employed in Dade.

74. During the time period between 1980 to 1984, Carolina Freight only hired six drivers, two Blacks and four Whites. A study of such a small sample would have an extremely high margin of error from a statistical standpoint.

75. As the second portion of its analysis, the EEOC study considered the statistical information of prison sentences imposed upon Hispanics and non–Hispanic Whites to determine if these groups have a different likelihood of serving active prison terms.

76. The report also considered population trends in Dade County. In 1980, non–Hispanic Whites represented 35.7% of the population. In 1985, non–Hispanic Whites represented 37.3% of the population while Hispanics represented 43.3%. In 1990, it is projected that non–Hispanic Whites will represent 35% of the population while Hispanics will represent 45.4%.

77. The study provided statistics concerning the ethnic/national origin distribution of all persons (16 years of age or older) convicted in state court of felonies resulting in an active prison sentence from January 1, 1984 through September 13, 1988 for Dade County:

| | Total | Non–Hispanic White | Hispanic |
|---|-------|--------------------|----------|
| **1984** | | | |
| Convictions | 31,805 | 4,930 | 9,470 |
| Population | 1,384,890 | 573,192 | 582,288 |
| Convictions/ Population | | .008601 | .016263 |
| Convictions/ 1,000 persons | | 8.601 | 16.263 |

|  | Total | Non–Hispanic<br>White | Hispanic |
|---|---|---|---|
| **1988** | | | |
| Convictions | 31,805 | 4,930 | 9,470 |
| Population | 1,459,938 | 522,410 | 653,221 |
| Convictions/<br>Population | | .008925 | .014497 |
| Convictions/<br>1,000 persons | | 8.925 | 14.497 |

In both of these years, the probabilities that the statistical disparities could have occured by chance are far above the .01 level, thereby equating to more than three standard deviations.

78. The EEOC study includes an alternative conviction analysis, providing statistics concerning the ethnic/national origin distribution of all persons (16 years of age or older) convicted in state court of the felonies of larceny and burglary resulting in an active prison sentence from January 1, 1984 through September 13, 1988 in Dade County:

|  | Total | Non–Hispanic<br>White | Hispanic |
|---|---|---|---|
| **1984** | | | |
| Convictions | 17,634 | 2,952 | 4,708 |
| Population | 1,384,890 | 573,192 | 582,288 |
| Convictions/<br>Population | | .005150 | .008085 |
| Convictions/<br>1,000 persons | | 5.515 | 8.085 |
| **1988** | | | |
| Convictions | 17,634 | 2,952 | 4,708 |
| Population | 1,459,938 | 522,410 | 653,221 |
| Convictions/<br>Population | | .005344 | .007207 |
| Convictions/<br>1,000 persons | | 5.344 | 7.207 |

79. The EEOC study did not consider any data from Broward County's court system or the federal court system for either county. Moreover, since the names of the convicted persons were unavailable, the report does not account for recidivism.

80. The EEOC report found that in Dade County, Hispanics represented 29.8% of all persons who were convicted of felonies which resulted in an active prison sentence as compared to non–Hispanic Whites who made up 15.5% of the total. Hispanics represented 26.7% of all persons who were convicted of larceny and theft felonies as compared to 16.7% Whites who were convicted of the same offenses resulting in an active prison sentence.

81. During the relevant period of this suit, Carolina Freight's Fort Lauderdale terminal paid casual and regular drivers the same hourly rate of $13.23 per hour.

82. Carolina Freight contributed $58.70 to the health and welfare benefits on behalf of regular employees on a weekly basis from April 1, 1983 to March 31, 1984. The amount increased to $72.50 from April 1, 1984 to March 31, 1985. The company contributed nothing for such benefits on behalf of casual drivers.

83. Carolina Freight contributed $55 on a weekly basis to regular employees for pension benefits from April 1, 1983 through March 31, 1985. The company contributed $8 per day worked to a casual employee's pension fund. Carolina Freight therefore contributed $1,120 on behalf of Mr. Rios since he worked 140 days from February 20, 1984 to October 16, 1984.

84. In 1984, Mr. Rios was called to work as a casual driver at Carolina Freight on a regular basis. He worked the following amount of time:

| Time Period–1984 | Days Worked: Total Work Days in Period |
|---|---|
| January–March | 38:65 |
| April–June | 57:65 |
| July–September | 52:63 |
| October | 9:62 |
| Total | 156:255 |

85. From October 18, 1984 to December 31, 1984 when Mr. Rios was employed with Consolidated Freightways as a casual driver, he worked 31.5 days out of a possible 52 days. This averages into three days per week for this period.

88. Had Mr. Rios not been terminated in October 1984, it is certain that Carolina Freight would have employed him through its peak season ending on November 30, 1984 because of its needs and Rios' past work history. Based on his past work history during the busiest three-month period of the year, Rios would have worked 34 days for the period between October 16, 1984 and November 30, 1984. During the same six week period, Rios worked only 19 days with Consolidated Freightways.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of this action and over the parties pursuant to section 706 of Title VII, 42 U.S.C. § 2000e–5(f)(3), and 28 U.S.C. § 1343(a)(4). The Court has previously found that the EEOC has satisfied all conditions precedent to this suit, thereby dismissing the defendant's fifth and sixth affirmative defenses. *See EEOC v. Carolina Freight Carriers Corp.*, 686 F.Supp. 309 (S.D.Fla.1988). Venue is also proper as the complaint alleges that the unlawful employment practice was committed within this district. *See* 42 U.S.C. § 2000e–5(f)(3).

■ Before addressing the three substantive claims in this case, the court must address certain preliminary matters which have been raised by the parties. First, the defendant, Carolina Freight, attempted to introduce evidence at trial regarding the national origin distribution at its terminal in Miami, Florida. The court denied admission. In pretrial proceedings, the defendant adamantly argued that any discovery concerning any terminal other than Fort Lauderdale outside the time period 1980 to 1984 was "totally irrelevant and immaterial to and beyond the proper scope of the litigation." Defendant's Memorandum in Opposition to Plaintiff's Motion for Reconsideration at 3; *also see* pages 4 and 6. On this basis, the court denied the plaintiff's motions to obtain discovery on employees outside the four year time period who worked at other terminals. Therefore, the court finds that the defendant, Carolina Freight, is ESTOPPED from introducing evidence concerning employees at its Miami terminal.

■ The second preliminary matter is the outstanding affirmative defenses which the defendant continues to assert. Carolina Freight asserts in its third affirmative defense that laches is applicable. Assuming without finding that there was an unreasonable delay in filing this action, there was no evidence adduced at the trial of any significant prejudice to Carolina Freight. Moreover, in its eighth affirmative defense, the defendant alleges that its minimum qualifications standards constituted a bona fide occupational qualification permissible under section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e)(1). That section *allows* an employer to discriminate on the basis of national origin, *inter alia*, if such charac-

teristics are bona fide occupational qualifications reasonably necessary for the employer's business needs. This exception is not to be confused with the business justification defense available to a party defending a disparate impact claim. Since Carolina Freight never contends that it hired the regular drivers at its terminal *because* of their national origin, the exception has no bearing here.

■ Finally, Carolina Freight continues to assert that the consent decree between itself and the United States Department of Justice bars this action. *See* Fourth Affirmative Defense (res judicata and/or collateral estoppel). However, the language of the decree belies any such contention. On page 4 of the order, the parties agreed that: "Notwithstanding the remedies provided by law in the event of violations of the terms of this decree, no individual will be deprived of any other lawful remedy which he may have against the Company or any employee, agent or officer thereof on account of individual instances of discrimination." *See* Decree in Partial Resolution of Suit, *United States v. Carolina Freight Carriers Corp.* (W.D.N.C. October 8, 1971) (McMillan, J.). Even in the absence of this language, it is doubtful that the consent decree would bar this action as different parties are involved and this action concerns national origin, not race.

## Retaliation

The EEOC's first claim is that Carolina Freight violated section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a), by retaliating against Mr. Rios. Specifically, Rios contends that he was fired by the defendant because he filed a charge of discrimination with the Broward County Human Rights Board (BCHRB) alleging that he was wrongfully refused a regular driver position.

■ A prima facie case of retaliation actionable under Title VII requires proof of the following elements: (1) the employee engaged in activity protected by section 704(a), (2) the employee suffered an adverse employment consequence, and (3) a causal relationship exists between the first two elements. *See Canino v. EEOC*, 707 F.2d 468, 471 (11th Cir.1983). While *not* listed an explicit element, the plaintiff is also required to show that the employer had actual knowledge that the employee was engaged in protected activity. *Cf. Doyal v. Marsh*, 777 F.2d 1526, 1534 (11th Cir.1985) (mentioning this element without disavowing its validity). Actual knowledge is required to raise the inquiry that the adverse employment action and the employee's activities were causally linked.

The litigants stipulate to the first element. Clearly, the filing of a charge of discrimination is an activity protected under section 704(a). *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1003–07 (5th Cir.1969).

It is not necessary that this court to find a Title VII violation to hold the defendant liable for retaliation. If the complaining employee filed a charge with a reasonable, good faith belief that the employer's practice violates Title VII, it is immaterial if the charge is later determined to be without merit. In this case, there is no allegation or proof that the charge was filed in bad faith. Further, Rios' charge was reasonably based. He had been told by the terminal's operation manager, John Henderson, that he was a superior employee. He had worked for the company for almost four years without being promoted to a regular position. Rios was also the only Hispanic worker at the terminal during his four years experience. Finally, on the two occasions that Carolina Freight hired casuals for regular driving positions, he was passed over and non–Hispanics were promoted.

■ The parties also stipulate that Rios' firing was an adverse employment action within the meaning of section 704(a). Therefore, the only contested issues pertain to the defendant's knowledge of the charge and its motive for terminating Rios' services in October 1984.

In terms of Carolina Freight's knowledge of the charge, the court finds that Mary–Anne Robertson, the BCHRB attorney assigned to Rios' charge, telephoned Mac

Brawley, head of Carolina Freight's personnel office in Cherryville. She identified herself and her organization, noted that Rios' charge was the reason for her call, and asked Brawley why the company refused to hire Rios as a regular driver based on his convictions when they continued to allow him to drive their trucks as a casual worker. The court finds that this call was made at some time between October 2, 1984 and October 15, 1984.

Carolina Freight also had written notice of the charge prior to terminating Rios. On May 24, 1984, the BCHRD mailed a Notice of Charge of Discrimination to Carolina Freight's Fort Lauderdale terminal. More significantly, the BCHRD mailed a Notice of Hearing to Carolina Freight on October 2, 1984 notifying the parties that a hearing was scheduled for October 16, 1984.

The final issue is causation. Rios is not required to show that he was fired in retaliation because of Carolina Freight's discriminatory intent. Rather, he must only prove that the employer acted adversely in an effort to punish him for filing the charge. As long as the protected activity and the adverse action were not "wholly unrelated", the plaintiff has established a prima facie case.

However, similar to claims of discrimination, a party defending a retaliation claim can rebute the prima facie case by raising an issue of fact as to its motive for the action. The burden of production then shifts to the complaining employee to demonstrate that the proffered explanations are pretextual. The employee always maintains the burden of persuasion, even if the employer offers no evidence. *See Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1327–28 (5th Cir. Unit B 1980) (applying *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, framework to retaliation claims); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 & n. 2 (11th Cir. 1986) (citing *Whatley* and applying *McDonnell Douglas* ).

Carolina Freight contends that Rios was fired because he lied on his application and

he had a prior conviction resulting in an active prison term. While the company has meet its burden of production, the court also finds that the plaintiff has proved, by a preponderance of evidence, pretext. Carolina Freight's management at the Fort Lauderdale terminal knew about Rios' alleged misrepresentations and his prior criminal history at some time between September 1983 and February 1984. Yet, the company continued to use Rios as a casual driver until October 16, 1984.

Kenneth Lee admitted that he retained Rios' services after discovery of the problems with his background because of an increase in business and a lack of manpower at the terminal. The months of September through November were peak business periods. As of the date of Rios' firings, there was no convincing proof adduced at trial showing either a significant decrease in business or an increase number of drivers being hired to meet the company's needs. With the company needing Rios' services, there would be no reason to fire him in mid–October since the fact of his convictions and alleged application falsifications had already been discovered. To be consistent with their argument, Carolina Freight would have fired Rios at the end of November 1984, after business subsided.

Other evidence also indicates pretext. As noted previously, Carolina Freight received written notice of Rios' charge at the end of May 1984. In early October 1984, the Fort Lauderdale management received written notification that the charge was to be heard before the Broward County agency on October 18, 1984. At some time between October 2 and October 16, 1984, the BCHRB's attorney, Ms. Robertson telephoned Brawley at the Cherryville personnel office. Then, Rios was fired on October 16, only two days before the scheduled hearing. *See Balicao v. University of Minnesota*, 737 F.2d 747, 749 (8th Cir.1984) (the close proximity in time between an employee's complaint and her termination can raise an inference of retaliation). This court does not accept Carolina Freight's suggestion that the dates are merely coincidences.

Moreover, the conversation between Rios and Lee at the terminal on the day of the firing is also illuminating. The court believes Rios's version of the conversation wherein Lee stated that the had directions from "higher up" to "let him go". The "higher up" can only be interpreted as referring to communications from Brawley to Lee after the telephone call was made by Robertson.

Finally, Carolina Freight's own actions in another related employment decision belie their defense. In 1981, Charles Cypher, a casual worker at the terminal, was considered for hiring as a regular driver. The company discovered a misrepresentation in his personnel file regarding his years of driving experience. He was not given the promotion and the company contemporaneously discontinued his services as a casual. In Rios' case, he was not fired contemporaneously, but was retained for eight to twelve months (depending on when Lee discovered Rios' first polygraph report) after the discovery of his convictions.

For the above reasons, this court finds that Carolina Freight fired Francisco Rios on October 16, 1984 as intentional retaliation for the filing of a charge of discrimination with the Broward County Human Rights Board.

### Disparate Impact

The second claim asserted by the EEOC is that Carolina Freight violated section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), by maintaining a discriminatory employment practice. Specifically, the EEOC contends the defendant's policy which bars applicants for employment with a felony, theft, or larceny conviction resulting in an active prison sentence has a disparate impact upon Hispanics.

Section 703(a)(1) provides: "It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any · individual ... because of such individual's ... national origin." The objective of Title VII is to assure "equality of employment opportunities" for all individuals and to remove barriers which discriminate against protected classes or freeze existing inequalities. *See Griggs v.* *Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971). Although it is undisputed that Carolina Freight's conviction policy is facially neutral, the claim of disparate impact reaches those "practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853.

In the recent case of *Wards Cove Packing Co., Inc. v. Atonio,* —— U.S. ——, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the Supreme Court clarified the elements and procedural burdens of a disparate impact claim. The employee must initially identify a specific employment practice which causes a disparate impact upon members of a protected class. Proof of these facts raises an inference of discrimination. The employer can then rebute this presumption by articulating the business necessity for the employment practice. This aspect of a disparate impact claim requires consideration of the justification offered and the availability of alternate practices which achieve the same business ends, but have a less restrictive impact upon minority employees. If the employer meets its burden of production on business necessity, the plaintiff can still prevail by showing that the employer's reasons are pretextual. Unlike the shifting burden of production, the plaintiff always carries the burden of persuading the court by a preponderance of the evidence that the employer maintains a practice that discriminates against members of a protected class.

Mr. Rios belongs to the amorphous, national origin classification known as Hispanic. The EEOC has also identified Carolina Freight's policy relating to lifetime convictions for theft crimes resulting in an active prison sentence. Hence, in regards to the plaintiff's prima facie case, the remaining issues are whether the conviction policy has a disparate impact upon Hispanics and if this imbalance is attributable to the employer's practice.

The EEOC's claim of disparate impact is based upon the statistical study prepared by Ms. Elvira Sisolak. The first part of the study deals with the lack of full-time Hispanic drivers at the Fort Lauderdale termi-

nal. The second part examines the relationship between the defendant's conviction policy and the alleged imbalance of Hispanic drivers in relation to employees of non–Hispanic origin.

■ Based on the study, the court finds that Hispanics are convicted at a substantially higher rate than non–Hispanics and that an employment practice which disqualifies applicants because of a conviction for a theft crime resulting in a prison term adversely impacts Hispanics at a statistically significant rate exceeding that of non–Hispanics. However, the EEOC has failed to prove, by a preponderance of the evidence, that there is significant imbalance of Hispanics at the Fort Lauderdale terminal or that any alleged disparity is caused by Carolina Freight's conviction policy.

While the factual assumptions made by the EEOC's expert are justified, the study is based upon incomplete data. While statistics are still an adequate basis for showing disparate impact, *see Wards Cove*, 109 S.Ct. at 2121, the proper inquiry focuses on the national origin composition of the jobs at issue and the national origin composition of the relevant labor market. *Id.*

Unquestionably, the six regular truck driver positions which opened during the period of Rios' employment, were all filled by non–Hispanics. However, the EEOC study fails to adequately define the relevant labor market.

The EEOC's reliance on the job category "operative" is overinclusive. The jobs at issue here are truck drivers. Operatives are not limited to those drivers who can operate tractor trailers, but include many occupations involving the functioning of a mechanism. In terms of the alternate analysis restricted to truck drivers, the data is derived from the 1980 Census. This information is of questionable validity. In 1980, 6,345 individuals identified themselves as truck drivers. However, based upon the more recent data from the state of Florida, there were only 3,700 truck driving positions available in Broward County in 1988.

There are other deficiencies in the statistical study. The sample size is inadequate.

The EEOC expert used the list of all regular drivers at the terminal to compute the ratio of Hispanics compared to non–Hispanics. However, only six drivers were hired for full-time positions during the period of Rios' employment with Carolina Freight. Four of these drivers were White Americans and two were Black Americans. The EEOC presented no data on the percentage of Hispanics employed as regular drivers at Carolina Freight's other terminals around the county and there was no examination of the national origin of drivers before Mr. Rios was hired as a casual in 1980. The EEOC's focus on one terminal for a limited four year period where only six driving positions were open is an inadequate sample to conduct a statistically significant study. *Cf. Pace v. Southern Railway Systems*, 701 F.2d 1383, 1388–89 (11th Cir. 1983) (sample with 11 worker reassignments and 12 demotions found by district court to be too small). Finally, the study fails to present any data of the percentage of Hispanic truck drivers living in Broward County who commute to Dade County to work. By including Dade drivers who commute to Broward, the figures overrepresent the number of Hispanics available for Carolina Freight positions at the Fort Lauderdale terminal.

■ Even if the EEOC had demonstrated an imbalance of Hispanic truck drivers at the Fort Lauderdale terminal, there was inadequate proof that Carolina's lifetime conviction bar caused the alleged disparaties. Because the EEOC study did not examine applicant flow data, there was no evidence that any specific number of Hispanic drivers were disqualified for employment. The study also did not attempt to show that any significant number of drivers were deterred from applying for work because of the defendant's conviction policy. Finally, there was no proof of what percentage of Hispanics with convictions would be otherwise qualified for employment. The plaintiff contends that the only relevant job standard for the regular truck driving position is the ability, via experience or education, to operate tractor trailers. However, this position is inconsistent

with its burden to demonstrate causation because the EEOC asserts that the only reason for the imbalance at the terminal is the third tier of Carolina Freight's conviction policy. Unless the pool of employees and applicants who are otherwise qualified is determined, it is unclear the number of Hispanic truck drivers affected by the policy.

■ In meeting its burden of production, Carolina Freight has articulated a legitimate, non-discriminatory justification for its conviction policy. The defendant is engaged in the business of transporting freight in tractor trailers. Both the truck and the cargo are worth a large amount of money. A significant percentage of Carolina Freight's shipments are classified as high risk. Regular truck drivers perform their duties without significant supervision. They are not only responsible for their trucks and cargoes, but also for reporting freight deficiencies to the terminal and turning over cash collected from customers.

Unfortunately, the company incurs large annual losses from theft at both the terminal and corporate level. Carolina Freight's management has determined that the vast majority of the losses are attributable to employee theft. Unfortunately, there has not been sufficient evidence against any one employee to initiate criminal prosecutions. Given the responsibility of its regular truck drivers and the problem of employee theft, Carolina Freight has concluded that its conviction policy is necessary to minimize its losses.

To show business necessity, the defendant must produce evidence that its challenged conviction practice "serves, in a significant way, the legitimate employment goals of the employer". *See Wards Cove,* 109 S.Ct. at 2125–26. Because the employer only has a burden of production on this issue, it is sufficient if the evidence raises a genuine issue of fact. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). It is not required that Carolina Freight's conviction policy be "essential" or "indispensable" to its business needs. If the policy is necessary and not a "mere insubstantial justification" the defendant has articulated business necessity. *See Wards Cove,* 109 S.Ct. at 2126.

The EEOC asserts that a lifetime bar to employment based upon a conviction for a theft crime resulting in a prison sentence is not justified by Carolina Freight's business needs. The plaintiff relies upon the case of *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290 (8th Cir.1975). There, a panel of the Eighth Circuit Court of Appeals rejected the employer's practice of refusing employment to any person convicted of a crime other than a minor traffic offense. The employer offered the following justifications for its policy: (1) fear of cargo theft, (2) handling company funds, (3) bonding qualifications, (4) possible impeachment of an employee as a witness, (5) possible liability for hiring persons with known violent tendencies, (6) employment disruption caused by recidivism, and (7) alleged lack of moral character of persons with convictions. *Id.* at 1298. The apparent basis for the ruling was the employer's policy was believed to "rest[ ] upon a tenuous or insubstantial basis" in that "no consideration is given to the nature and seriousness of the crime in relation to the job sought." *Id.* at 1296, 1297.

While *Green* could be limited to those situations where the linkage between the employer's business needs and the conviction policy is minimal, the case may also be broadly read to bar all employment conviction policies. With all due respect to the members of the Eighth Circuit, their holding is ill founded.

Mr. Rios was convicted of receiving stolen property and larceny in 1968 and 1969. He was sentenced to a 24 to 60 month prison sentence on the latter charge and he actually served 18 months in jail.

The plaintiff's position that minorities should be held to lower standards is an insult to millions of honest Hispanics.

It is true that Mr. Rios' conviction and prison term were over ten years old at the time he applied for employment with Carolina Freight and he had no subsequent convictions. Although this court rejoices

along with the angels of God for every sinner that repents, to say that an applicant's honest character is irrelevant to an employer's hiring decision is ludicrous. In fact, it is doubtful that any one personality trait is more important to an employer than the honesty of the prospective employee.

It is exceedingly reasonable for an employer to rely upon an applicant's past criminal history in predicting trustworthiness. The court in *Richardson v. Hotel Corp. of America*, 332 F.Supp. 519, 521 (E.D.La.1971), aff'd, 468 F.2d 951 (5th Cir. 1972), observed:

> A past criminal record affords no basis to predict that a given person will commit a future crime. But the evidence indicates that a group of persons who have been convicted of serious crimes will have a higher incidence of future criminal conduct than those who have never been convicted. It is reasonable for management ... to require that persons employed in positions where they have access to valuable property of others have a record reasonably free from convictions for serious property related crimes.

Obviously a rule refusing honest employment to convicted applicants is going to have a disparate impact upon thieves. That some of these thieves are going to be Hispanic is immaterial. That apparently a higher percentage of Hispanics are convicted of crimes than that of the "White" population may prove a number of things such as: (1) Hispanics are not very good at stealing, (2) Whites are better thieves than Hispanics, (3) none of the above, (4) all of the above.

Regardless, the honesty of a prospective employee is certainly a vital consideration in the hiring decision.

If Hispanics do not wish to be discriminated against because they have been convicted of theft then, they should stop stealing. As noted by the U.S. Supreme Court, "Congress did not intend by Title VII ... to guarantee a job to every person regardless of qualifications." *Griggs*, 401 U.S. at 430, 91 S.Ct. at 853. Employers are not required to give preferences to minorities merely because of their protected status, but rather to hire *all* applicants meeting the job's qualifications. *Id.* at 434–35, 91 S.Ct. at 855–56.

In this case, the court will answer a question that federal courts have vacillated on since the adoption of the Civil Rights Act of 1964: Can an employer refuse to hire persons convicted of a felony even though it has a disparate impact on minority members?

This court's answer is a firm "Yes".

To hold otherwise is to stigmatize minorities by saying, in effect, your group is not as honest as other groups.

The next stage of the business necessity test focuses on the availability of alternate employment practices which are equally effective in achieving the same business ends and have a less restrictive impact on Hispanics. *See Wards Cove*, 109 S.Ct. at 2127. While the employer has the burden of production, it is the employee who carries the burden of proof to show there are, indeed, alternate practices. *Id.* at 2126.

The EEOC contends that a lifetime bar as opposed to a five to ten year limit on consideration of convictions is an available option for Carolina Freight. However, apparently on the mistaken view that the defendant carried the burden of persuasion on this issue, the plaintiff failed to adduce proof that such a limited conviction policy would be either equally effective in deterring employee theft or have a less restrictive effect on the hiring of Hispanic truck drivers.

Indeed, the court finds Carolina Freight's practice to be an acceptable employment standard. The policy only bars applicants who are *convicted* of a *theft* crime involving an *active prison sentence*. Employees are not penalized for mere arrests or commission of non-theft felonies. Moreover, applicants are only disqualified if they actually serve time in jail. This aspect of the policy reflects the employer's assessment that a court's decision to imprison a defendant is a reliable indication of the prospective employee's character. In Mr. Rios' case, he was barred from hiring because of

his second conviction even though he had committed the earlier crime of receiving stolen property.

Carolina Freight has offered a business necessity for its conviction policy: the need to minimize losses from employee theft. The defendant introduced evidence that its theft losses were lower than the average in the trucking industry as a whole. Further, Carolina Freight's management believes its conviction policy is both effective and integral to maintaining employee theft at an acceptable level. With the lack of contrary proof from the plaintiff, this court will not overturn the employer's judgment. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978) ("Courts are generally less competent than employers to restructure business practices"); *Wards Cove,* 109 S.Ct. at 2127 ("the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternate selection or hiring practice in response to a Title VII suit."); *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096 (Title VII was not intended to "diminish traditional management prerogative"); *also see Avant v. South Central Bell Telephone Co.,* 716 F.2d 1083 (5th Cir.1983) (practice of firing employees for undisclosed, prior larceny conviction upheld); *Richardson,* 332 F.Supp. 519 (E.D. La.1971) (conviction policy upheld as business necessity), aff'd, 468 F.2d 951 (5th Cir.1972).

The plaintiff has also not convinced this court that Carolina Freight applied its conviction policy pretextually to discriminate. Rios was retained until 1984 because of the previous nondiscovery of his two convictions, his good work performance, and the business needs of the company. The court finds that Carolina Freight would have terminated Rios employment because of his criminal record at the end of November 1984 had it not retaliated against him in October 1984.

The plaintiff argues that, because more Hispanics have been convicted of felonies than Whites, the defendant's policy has a disparate impact on Hispanics. Even if this is true, the lesson is not to lower the employer's standards, but to raise the qualifications of Hispanics applying for jobs. *Cf. Green,* 523 F.2d at 1300 (dissent of Gibson, C.J., to en banc decision to deny rehearing) (The panel's decision in *Green* "judicially create[s] a new Title VII protected class—persons with conviction records.").

### Disparate Treatment

The EEOC's final claim is that Carolina Freight violated section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), by discriminating against Francisco Rios because of his national origin.

To prevail on a disparate treatment claim, the plaintiff must show the employer acted against the employee with discriminatory intent. *Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The employer's state of mind can be proven with direct or indirect evidence.

There is no direct evidence that Carolina Freight treated Mr. Rios any differently than its non–Hispanic employees. He worked at the terminal for four years. The only allegation of discrimination is the employer's failure to hire him as a regular driver. Even after the company discovered Rios' prior convictions, they retained his services to meet its business needs.

Even without direct proof, the EEOC can raise an inference of discriminatory intent by relying upon the test enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff has the initial burden of producing a prima facie case of hiring discrimination. There must be a showing that the employee: (1) belongs to a protected class, (2) applied for and was qualified for the job opening, (3) despite his qualifications, he was rejected, and (4) after the rejection, the position was filled by a person outside the protected group or the employer continued to seek other non-minority applicants with the same qualifications to fill the vacancy. *Id.* at 802, 93 S.Ct. at 1824.

Assuming the plaintiff establishes a prima facie case, the burden of production then shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the failure to hire. In rebuttal, the employee can still prevail by proving that the defendant's articulated reason is merely pretextual. As is the case in a disparate impact claim, the burden of persuasion "remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

■ The EEOC has failed to offer a prima facie case of discriminatory intent. As noted above, the employee must be qualified for the position sought. It is undisputed that Rios was disqualified because of his prior conviction resulting in a prison sentence. The plaintiff contends that the only legitimate qualification for the position of regular driver was the ability to operate a tractor trailer. However, this court has already found that the employee's honesty is an important and legitimate consideration in hiring decisions.

Even though the plaintiff has a less than perfect showing on all four elements of its prima facie case, it may still prevail if other probative evidence is present. *See McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (elements of a prima facie case vary with the facts of each case). However, no such proof was introduced here. The Broward County Human Rights Board found, at both the trial and appellate level, that there was no evidence of discrimination. While the EEOC did present a statistical study, the first part of the report is of questionable reliability given the earlier discussed deficiencies in methodology. There was also no showing that Carolina Freight either hired any non–Hispanic for a regular truck driving position or retained an employee as a casual driver who did not meet its conviction policy.

Even if there was a prima facie showing of discrimination, the defendant articulated legitimate, nondiscriminatory reasons for not hiring Mr. Rios. When Carolina Freight decided to fill a regular driving position in 1983–84, it discovered Rios' prior convictions and prison record and disqualified him from promotion. Benjamin Bryant, a Black American, was chosen from the remaining pool of employees. In fact, the Fort Lauderdale management believed Bryant was more qualified than Rios even if the latter had been considered for the position.

Finally, there was no convincing evidence that Carolina Freight applied its conviction policy pretextually to discriminate against Hispanics.

■ Having found Carolina Freight retaliated against Francisco Rios, the plaintiff is entitled to relief. When an employer intentionally engages in an unlawful employment practice, Title VII provides for injunctive relief and "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief." *See* 42 U.S.C. § 2000e–5(g). In appropriate cases, the court may award prejudgment interest, *Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507 (11th Cir.1987) (I.R.S. prime rate), and a monetary judgment equal to the value of lost fringe benefits, *Crabtree v. Baptist Hosp. of Gadsden, Inc.*, 749 F.2d 1501 (11th Cir.1985). The overall purpose of the relief is not to punish the employer, but to make the employee "whole for injuries suffered". *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

■ Title VII requires the employee to act with reasonable diligence in seeking alternate employment. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Here, Mr. Rios certainly met this requirement as he obtained new employment with Consolidated Freightways only two days after he was terminated by Carolina Freight.

The only remaining question is the measure of the plaintiff's injuries. The court finds that Carolina Freight would have worked Rios until the end of November 1984 had it not wrongfully discharged him in October 1984. Therefore, he is entitled to the difference in wages and fringe benefits that he would have earned while working with Carolina Freight and the amounts actually paid by Consolidated Freightways

from October 18, 1984 to November 30, 1984. An award of prejudgment interest on this sum at the I.R.S. prime rate is also appropriate.

Rios worked fifteen days less at Consolidated than he would have worked with Carolina Freight. Based on the hourly wage of $13.23 and an eight-hour workday, the plaintiff is entitled to an award of $1,587.60. The lost pension contribution for these fifteen days at the daily rate of $8 equals $120. Hence, the aggregate award is $1,707.60.

Having considered the above matters and the record in this cause, it is hereby

ORDERED AND ADJUDGED as follows:

(1) The defendant, Carolina Freight Carriers Corporation, is RESTRAINED from retaliating against any of its employees for filing a charge of discrimination with any governmental agency.

(2) Judgment is hereby ENTERED against the plaintiff, the Equal Employment Opportunity Commission, and in favor of the defendant, Carolina Freight Carriers Corporation, on the claims of disparate treatment and disparate impact.

(3) Judgment is hereby ENTERED in favor of the plaintiff, the Equal Employment Opportunity Commission, and against the defendant, Carolina Freight Carriers Commission, on the retaliation claim and the plaintiff shall be AWARDED the sum of $1,707.60 for back pay and pension contributions. Prejudgment interest shall also be assessed on this award from October 16, 1984 to the date of this order pursuant to the interest rate equal to the coupon issue yield equivalent of the average accepted auction price for the auction of fifty-two week U.S. Treasury bills during the applicable time period. *See* 28 U.S.C. § 1961(a). Further, because this Circuit has held that back pay accrues on a quarterly basis, the award of prejudgment interest shall also so accrue. *See Walters v. City of Atlanta,* 610 F.Supp. 715, 728 (N.D.Ga.1985) (citing *Darnell v. City of Jasper,* 730 F.2d 653, 656–57 (11th Cir.1984)). The computations are as follows:

| Time Period | Interest Rate | Accrued Interest | Accrued Principal |
|---|---|---|---|
| 12/84–2/85 | 9.17% | $39.15 | $1746.75 |
| 3/85–5/85 | 8.57 | 37.42 | 1784.17 |
| 6/85–8/85 | 7.91 | 35.28 | 1819.45 |
| 9/85–11/85 | 7.87 | 35.80 | 1855.25 |
| 12/85–2/86 | 7.71 | 35.76 | 1891.01 |
| 3/86–5/86 | 6.56 | 31.01 | 1922.02 |
| 6/86–8/86 | 5.63 | 27.05 | 1949.07 |
| 9/86–11/86 | 5.77 | 28.12 | 1977.19 |
| 12/86–2/87 | 6.09 | 30.10 | 2007.29 |
| 3/87–5/87 | 7.02 | 35.23 | 2042.52 |
| 6/87–8/87 | 6.98 | 35.64 | 2078.16 |
| 9/87–11/87 | 6.93 | 36.00 | 2114.16 |
| 12/87–2/88 | 6.59 | 34.83 | 2148.99 |
| 3/88–5/88 | 7.20 | 38.68 | 2187.67 |
| 6/88–8/88 | 8.32 | 45.50 | 2233.17 |
| 9/88–11/88 | 8.55 | 47.73 | 2280.90 |
| 12/88–2/89 | 9.32 | 53.14 | 2334.04 |
| 3/89–5/89 | 9.15 | 53.39 | 2387.43 |
| 6/89–8/89 | 8.27 | 49.36 | 2436.79 |
| 9/89–10/89 | 8.19 | 49.89 * | 2486.68 |

* (this period is based upon the interest rate for the September 21, 1989 auction).

Of course, the above rates are annual and must be reduced to quarterly rates by a factor of four. Based on these computations, total prejudgment interest in the sum

of $779.08 is hereby AWARDED.

Therefore, the total sum of the final judgment in this cause for back pay, pension contributions, and prejudgment interest is hereby ENTERED in the sum of $2,486.68. Postjudgment interest shall begin to accrue ten calendar days after the date of this order. Let execution hereby ISSUE.

DONE AND ORDERED.